PCM9.3.22
KSC\KYO: USAO#2019R00724



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | UNDER SEAL |
| v. | * | CRIMINAL NO. LKG-22-0316 |
| IAN H. NEWBOLD, | * | (Conspiracy to Distribute and Possess with Intent to Distribute Oxycodone, 21 U.S.C. § 846; Health Care Fraud, 18 U.S.C. § 1347; Aiding and Abetting, 18 U.S.C. § 2) |
| Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

### INDICTMENT

### COUNT ONE

**(Conspiracy to Distribute and Possess with Intent to Distribute Oxycodone)**

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

#### Introduction

1. Beginning at least in or about October 1, 2018 through in or about December 1, 2021, Defendant IAN NEWBOLD owned and operated the Newbold Medical Office, a medical office located in Hagerstown, Maryland. The Newbold Medical Office is a purported family medicine practice. A significant portion of the office's business was the practice of prescribing and dispensing controlled substances outside the scope of professional practice and without a legitimate medical purpose.

1

2.  Defendant NEWBOLD was the sole prescribing doctor at the Newbold Medical Office. He was also in charge of the office, including hiring and supervising employees, and approving and directing financial transactions on behalf of the Office.

3.  As the sole doctor at the Office, NEWBOLD was responsible for meeting with patients and determining appropriate treatment. He was also responsible for issuing prescriptions for medications to patients, where appropriate based on medical need.

4.  NEWBOLD would regularly meet with purported pain patients and would prescribe them large quantities of pain medications, such as oxycodone. NEWBOLD required them to come back frequently (often as much as once a week) to obtain additional prescriptions of oxycodone.

5.  These patients often paid cash for their visits. At each visit they paid for the office visit, even though they often did not meet with NEWBOLD at all, and simply picked up a new prescription.

### Controlled Substances – General Terminology

6.  21 U.S.C. § 812 establishes schedules for controlled substances based on the substances' potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence. Such controlled substances are listed in Schedule I through Schedule V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. Controlled substance pharmaceuticals are listed as controlled substances in Schedules II through V. There are other drugs that are available only by prescription but are not classified as controlled substances. 21 C.F.R. § 1308 provides further listings of scheduled drugs.

7. 21 U.S.C. § 822 specifies that controlled substances may only be prescribed, dispensed or distributed by those persons who are registered with the Attorney General of the United States to do so (with limited exceptions, such as delivery persons). The authority to register persons has been delegated to the DEA by the Attorney General.

8. 21 C.F.R. § 1306.04 sets forth the requirements for a valid prescription. It provides that for a "prescription for a controlled substance to be effective [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

9. 21 C.F.R. § 1311.100 sets forth the requirements for electronic prescriptions. It requires that "nothing in this part alters the responsibility of the practitioner and pharmacy in part 1306 of this chapter, to ensure the validity of a controlled substance prescription."

10. Oxycodone (brand names include OxyContin®, Percocet®, Percodan®, Roxicodone®) is a Schedule II controlled substance that is most commonly used for moderate to severe pain. Oxycodone is an opioid narcotic similar to morphine in its effects and potential for abuse and dependence. Because oxycodone is sold in large and potent dosage units, it is frequently diverted from the illicit market. Because of the large dosage units in which it is available and high potential for addiction, in addition to the high street value, oxycodone is a highly-desired drug.

11. The discipline of pain management is an accepted and recognized medical sub-specialty practiced by physicians throughout the United States. Legitimate and qualified pain management experts have specialized knowledge, education, training, and experience and utilize a multi-disciplinary approach, which sometimes includes, among other things, prescribing Schedule II, III, IV, and V controlled substances within the scope of the prevailing standards of

professional practice and with a legitimate medical purpose. A prescription for a controlled substance, however, violates the Controlled Substances Act and its implementing regulations if it is issued outside the scope of the prevailing standards of professional practice and without a legitimate medical purpose.

12. Oxycodone is frequently abused because it is a highly addictive narcotic that gives the user a "high" equivalent to heroin. Users who abuse pills containing oxycodone frequently do so by smoking, chewing, dissolving, injecting, or crushing the pills and then ingesting the substance. These methods result in a more immediate high because they allow the active ingredient to more quickly enter the user's system. Abuse of oxycodone can lead to overdose and, in some cases, death. The risk of overdose and death is increased if oxycodone is abused along with certain other prescribed controlled substances, such as Alprazolam. Similar to other illegal narcotics, oxycodone is sold by drug dealers to addicted users, typically for approximately $1 per milligram.

### The Charge

13. Beginning on a date unknown to the Grand Jury, but at least prior to in or about October 1, 2018, and continuing through at least in or about December 1, 2021, in the District of Maryland and elsewhere, the defendant,

**IAN H. NEWBOLD,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully distribute and possess with intent to distribute a mixture or substance containing oxycodone, also known as Oxycontin, Percocet, Roxicodone, Roxicet, and Endocet, a schedule II controlled substance, in

4

violation of Title 21, United States Code, Section 841(a)(l).

21 U.S.C. § 846

### Objects of the Conspiracy

14. It was the object of the conspiracy to profit from the illegal distribution of oxycodone.

15. It was further the object of the conspiracy to issue prescriptions for oxycodone to individuals without a legitimate medical need so that they could either use them to satisfy an addiction or to re-sell the pills for a profit.

16. It was further the object of the conspiracy to charge $100 or more for each prescription and require individuals to pay cash to obtain their prescriptions, unless they had Medicare insurance.

17. It was further the object of the conspiracy to charge Medicare for complicated office visits when, in fact, prescriptions were provided to individuals without ever seeing a practitioner.

18. It was further an object of the conspiracy to increase the number of office visits required – often requiring individuals to come to the clinic once a week, even though they never saw a doctor – in order to increase the amount of income to the clinic.

### Manner and Means of the Conspiracy

19. Among the manner and means used by the defendant and other co-conspirators to carry out the object of the conspiracy were the following:

20. It was part of the conspiracy that the Office charged patients seeking oxycodone and other pain medications cash in order to generate revenue for the Office.

5

21. It was part of the conspiracy that the Office charged those patients who had insurance, such as Medicare or Medicaid, an additional $50 fee if they were obtaining pain medication, such as oxycodone.

22. It was part of the conspiracy that the Office made patients obtaining pain medications, such as oxycodone, visit the office as much as once per week in order to charge them for additional office visits.

23. It was part of the conspiracy that NEWBOLD allowed individuals seeking pain medications to determine whether they needed to see NEWBOLD during an office visit. It was also part of the conspiracy that NEWBOLD often did not see patients seeking pain medications at all during their office visits and that a visit frequently consisted of a patient obtaining a new prescription from the front desk and paying for the visit before leaving.

24. It was part of the conspiracy that NEWBOLD frequently wrote out prescriptions for pain medications in advance of the office visits so that a patient could obtain their prescription at the front desk without having to see NEWBOLD. As a part of that, NEWBOLD would pre-write prescriptions so that patients could be served and charged even when NEWBOLD was on vacation or out of state.

25. It was part of the conspiracy that, if he actually saw a patient seeking pain medication, NEWBOLD did not conduct any physical examination. It was also part of the conspiracy that NEWBOLD did not attempt to adjust pain patients' medication levels or identify other means of treating their pain beyond prescribing opioid pain medications.

26. It was part of the conspiracy that, NEWBOLD provided no actual treatment for causes of pain or referral to others who would treat that pain.

27.     It was part of the conspiracy that patients traveled to pharmacies in various parts of Maryland, West Virginia, Pennsylvania, and other states in order to fill the prescriptions issued by NEWBOLD.

### Overt Acts

28.     In furtherance of the conspiracy, and to effect the illegal object thereof, the defendant and his co-conspirators performed, participated in, and did the following acts, among others, in the District of Maryland and elsewhere:

*Undercover Officer 1 ("UC1")*

29.     On November 21, 2019, NEWBOLD issued a prescription for 39 pills of Oxycodone 10 MG to an undercover officer ("UC1"), in exchange for $150 in cash for an office visit. At the same time, staff at the Office scheduled UC1 for an additional visit five days later.

30.     On November 26, 2019, NEWBOLD issued a prescription for 39 pills of Oxycodone 10 MG to UC1, in exchange for $100 in cash for an office visit. UC1 did not see NEWBOLD and interacted only with office staff. At the same time, staff at the Office scheduled UC1 for an additional visit.

31.     On December 5, 2019, NEWBOLD issued a prescription for 39 pills of Oxycodone 10 MG to UC1, in exchange for $100 in cash for an office visit. UC1 did not see NEWBOLD and interacted only with office staff. At the same time, staff at the Office scheduled UC1 for an additional visit in approximately two weeks.

32.     On December 19, 2019, NEWBOLD issued a prescription for 39 pills of Oxycodone 10 MG to UC1, in exchange for $100 in cash for an office visit. UC1 did not see

NEWBOLD and interacted only with office staff. At the same time, staff at the Office scheduled UC1 for an additional visit.

33. On December 26, 2019, NEWBOLD issued a prescription for 39 pills of Oxycodone 10 MG to UC1, in exchange for $100 in cash for an office visit. UC1 did not see NEWBOLD and interacted only with office staff, who indicated that NEWBOLD was not at the Office that day. At the same time, staff at the Office scheduled UC1 for an additional visit.

34. On January 2, 2020, NEWBOLD issued a prescription for 39 pills of Oxycodone 10 MG to UC1, in exchange for $100 in cash for an office visit. UC1 did not see NEWBOLD and interacted only with office staff. At the same time, staff at the Office scheduled UC1 for an additional visit.

*Undercover Officer 2 ("UC2")*

35. On January 7, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $150 in cash for an office visit. At the same time, staff at the Office scheduled UC2 for an additional visit nine days later.

36. On January 16, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $100 in cash for an office visit. UC2 did not see NEWBOLD during this visit. At the same time, staff at the Office scheduled UC2 for an additional visit.

37. On January 29, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $100 in cash for an office visit. UC2 did not see NEWBOLD during this visit. At the same time, staff at the Office scheduled UC2 for an additional visit.

38. On February 5, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $100 in cash for an office visit. UC2 did not see NEWBOLD during this visit. At the same time, staff at the Office scheduled UC2 for an additional visit.

39. On February 20, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $100 in cash for an office visit. UC2 did not see NEWBOLD during this visit. At the same time, staff at the Office scheduled UC2 for an additional visit.

40. On February 27, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $100 in cash for an office visit. UC2 did not see NEWBOLD during this visit. At the same time, staff at the Office scheduled UC2 for an additional visit.

41. On March 5, 2020, NEWBOLD issued a prescription for 38 pills of Oxycodone-Acetiminophen 10-325 MG to UC2, in exchange for $100 in cash for an office visit. UC2 did not see NEWBOLD during this visit. At the same time, staff at the Office scheduled UC2 for an additional visit.

All in violation of Title 21, United States Code, Section 846.

## COUNTS TWO - EIGHTY THREE

### (Health Care Fraud)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs One through Twelve and Fourteen through Forty-One of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2. The Centers for Medicare and Medicaid Services ("CMS") requires that when physicians submit a claim for reimbursement from a health care benefit program, they must use a billing code developed by the American Medical Association ("AMA") known as a Current Procedural Terminology ("CPT") code. A CPT code is a five-digit numerical code that serves to identify the nature of the medical service provided by the physician. Each CPT code defines factual criteria that must be met in order to use that code for billing a particular medical service.

3. A physician or provider who has patients come into the office for visits must report the office visit on the claim submitted to Medicare by using the correct CPT code, along with any applicable modifiers. For office visits, a number of CPT codes, including 99212, 99213, and 99214 are used for descriptive and billing purposes.

4. CPT code 99212 is used when billing for "Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. When using time for code selection, 10-19 minutes of total time is spent on the date of the encounter."

5. CPT code 99213 is used when billing for "Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate

10

history and/or examination and low level of medical decision making. When using time for code selection, 20-29 minutes of total time is spent on the date of the encounter."

6. CPT code 99214 is used when billing for "Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and moderate level of medical decision making. When using time for code selection, 30-39 minutes of total time is spent on the date of the encounter."

7. A physician or provider must determine the appropriate code applicable to the office or other outpatient visit, based on the circumstances of the patient, complexity of the problems, and time required.

### Scheme and Artifice to Defraud

8. From on or about August 2018, and continuing through on or about April 2020, in the District of Maryland and elsewhere, the defendant,

**IAN H. NEWBOLD,**

did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, to wit, billing using CPT code 99214 for office visits when, in fact, no physician or providers actually met with the patient.

### **Manner and Means of the Scheme and Artifice to Defraud**

9. It was part of the scheme to defraud that the defendant, in order to obtain payments from a health care benefit program, would submit or cause to be submitted claims seeking

11

reimbursement for office visits under CPT code 99214 that were fraudulent in that NEWBOLD did not actually meet with the patient despite billing for a significant office visit.

10. It was part of the scheme and artifice to defraud that defendant NEWBOLD would submit or cause to be submitted claims seeking reimbursement reflecting that office visits had occurred under CPT code 99214 when NEWBOLD was not even present in the office that day.

### Executions of the Scheme and Artifice to Defraud

11. On or about the dates indicated below, in the District of Maryland, the defendant,

**IAN H. NEWBOLD,**

for the purpose of executing and attempting to execute the above-described scheme and artifice todefraud a health care benefit programs as defined in Title 18, United States Code, Section 24(b), to wit Medicare, in connection with the payment for health care benefits, items, and services, did knowingly and willfully submit and cause to be submitted and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of those health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, as specified below:

| Count | Patient | Date of Claim | Date Billed to Medicare | Amount Billed to Medicare | Nature of False Claim | Date Medicare Paid | Amount Paid by Medicare |
|---|---|---|---|---|---|---|---|
| 2 | C.F. | 11/27/2018 | 5/9/2019 | $173 | Office Visit | 5/28/2019 | $82.58 |
| 3 | C.F. | 12/4/2018 | 5/9/2019 | $173 | Office Visit | 5/31/2019 | $82.58 |

| 4 | C.F. | 12/11/2018 | 5/9/2019 | $173 | Office Visit | 5/31/2019 | $82.58 |
|---|---|---|---|---|---|---|---|
| 5 | C.F. | 1/16/2019 | 5/9/2019 | $173 | Office Visit | 5/28/2019 | $88.44 |
| 6 | C.F. | 1/30/2019 | 5/9/2019 | $173 | Office Visit | 5/28/2019 | $88.44 |
| 7 | C.F. | 2/6/2019 | 5/9/2019 | $173 | Office Visit | 5/31/2019 | $88.44 |
| 8 | C.F. | 2/21/2019 | 5/9/2019 | $173 | Office Visit | 5/31/2019 | $88.44 |
| 9 | C.F. | 3/28/2019 | 5/9/2019 | $173 | Office Visit | 5/28/2019 | $88.44 |
| 10 | C.F. | 4/4/2019 | 5/9/2019 | $173 | Office Visit | 5/28/2019 | $88.44 |
| 11 | C.F. | 4/17/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 12 | C.F. | 4/25/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 13 | C.F. | 5/2/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 14 | C.F. | 5/13/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 15 | C.F. | 5/23/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 16 | C.F. | 5/30/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 17 | C.F. | 6/6/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 18 | C.F. | 6/18/2019 | 10/25/2019 | $173 | Office Visit | 11/8/2019 | $88.44 |
| 19 | C.F. | 6/24/2019 | 11/8/2019 | $173 | Office Visit | 11/22/2019 | $88.44 |
| 20 | C.F. | 7/1/2019 | 10/25/2019 | $173 | Office Visit | 11/8/2019 | $88.44 |
| 21 | C.F. | 7/8/2019 | 10/25/2019 | $173 | Office Visit | 11/8/2019 | $88.44 |
| 22 | C.F. | 7/15/2019 | 10/25/2019 | $173 | Office Visit | 11/8/2019 | $88.44 |
| 23 | C.F. | 7/22/2019 | 10/25/2019 | $173 | Office Visit | 11/8/2019 | $88.44 |
| 24 | C.F. | 9/3/2019 | 10/25/2019 | $173 | Office Visit | 11/8/2019 | $88.44 |
| 25 | C.F. | 9/9/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 26 | C.F. | 9/16/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 27 | C.F. | 9/23/2019 | 9/30/2019 | $173 | Office Visit | 10/22/2019 | $88.44 |
| 28 | C.F. | 9/30/2019 | 10/31/2019 | $173 | Office Visit | 11/14/2019 | $88.44 |
| 29 | C.F. | 10/7/2019 | 10/31/2019 | $173 | Office Visit | 11/14/2019 | $88.44 |

| 30 | S.B. | 8/15/2018 | 10/9/2018 | $173.00 | Office Visit | 11/1/2018 | $82.58 |
|---|---|---|---|---|---|---|---|
| 31 | S.B. | 8/23/2018 | 10/9/2018 | $173.00 | Office Visit | 11/1/2018 | $82.58 |
| 32 | S.B. | 8/30/2018 | 10/9/2018 | $173.00 | Office Visit | 11/1/2018 | $82.58 |
| 33 | S.B. | 9/6/2018 | 10/9/2018 | $173.00 | Office Visit | 10/29/2018 | $82.58 |
| 34 | S.B. | 9/17/2018 | 10/9/2018 | $173.00 | Office Visit | 10/29/2018 | $82.58 |
| 35 | S.B. | 10/3/2018 | 10/9/2018 | $173.00 | Office Visit | 10/25/2018 | $82.58 |
| 36 | S.B. | 10/15/2018 | 12/3/2018 | $173.00 | Office Visit | 12/17/2018 | $82.58 |
| 37 | S.B. | 10/22/2018 | 12/3/2018 | $173.00 | Office Visit | 12/17/2018 | $82.58 |
| 38 | S.B. | 10/29/2018 | 12/3/2018 | $173.00 | Office Visit | 12/17/2018 | $82.58 |
| 39 | S.B. | 11/5/2018 | 12/19/2018 | $173.00 | Office Visit | 1/2/2019 | $82.58 |
| 40 | S.B. | 12/3/2018 | 4/1/2019 | $173.00 | Office Visit | 4/15/2019 | $82.58 |
| 41 | S.B. | 12/10/2018 | 2/5/2019 | $173.00 | Office Visit | 2/19/2019 | $82.58 |
| 42 | S.B. | 12/17/2018 | 2/5/2019 | $173.00 | Office Visit | 2/19/2019 | $82.58 |
| 43 | S.B. | 12/24/2018 | 4/12/2019 | $173.00 | Office Visit | 4/26/2019 | $82.58 |
| 44 | S.B. | 12/31/2018 | 4/12/2019 | $173.00 | Office Visit | 4/26/2019 | $82.58 |
| 45 | S.B. | 1/7/2019 | 5/17/2019 | $173.00 | Office Visit | 5/31/2019 | $88.44 |
| 46 | S.B. | 1/14/2019 | 5/17/2019 | $173.00 | Office Visit | 5/31/2019 | $88.44 |
| 47 | S.B. | 1/22/2019 | 5/17/2019 | $173.00 | Office Visit | 5/31/2019 | $88.44 |
| 48 | S.B. | 1/28/2019 | 5/17/2019 | $173.00 | Office Visit | 5/31/2019 | $88.44 |
| 49 | S.B. | 2/4/2019 | 5/29/2019 | $173.00 | Office Visit | 6/12/2019 | $88.44 |
| 50 | S.B. | 2/14/2019 | 5/29/2019 | $173.00 | Office Visit | 6/12/2019 | $88.44 |
| 51 | S.B. | 3/4/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |
| 52 | S.B. | 3/13/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |
| 53 | S.B. | 3/20/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |
| 54 | S.B. | 3/28/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |
| 55 | S.B. | 4/3/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |

| 56 | S.B. | 4/10/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |
|---|---|---|---|---|---|---|---|
| 57 | S.B. | 4/17/2019 | 8/1/2019 | $173.00 | Office Visit | 8/15/2019 | $88.44 |
| 58 | S.B. | 4/24/2019 | 9/30/2019 | $173.00 | Office Visit | 10/22/2019 | $88.44 |
| 59 | S.B. | 5/1/2019 | 9/30/2019 | $173.00 | Office Visit | 10/22/2019 | $88.44 |
| 60 | S.B. | 5/9/2019 | 9/30/2019 | $173.00 | Office Visit | 10/22/2019 | $88.44 |
| 61 | S.B. | 5/15/2019 | 9/30/2019 | $173.00 | Office Visit | 10/22/2019 | $88.44 |
| 62 | S.B. | 5/22/2019 | 9/30/2019 | $173.00 | Office Visit | 10/22/2019 | $88.44 |
| 63 | S.B. | 5/29/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 64 | S.B. | 6/5/2019 | 9/30/2019 | $173.00 | Office Visit | 10/22/2019 | $88.44 |
| 65 | S.B. | 6/12/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 66 | S.B. | 6/19/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 67 | S.B. | 7/3/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 68 | S.B. | 7/10/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 69 | S.B. | 7/17/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 70 | S.B. | 7/24/2019 | 10/24/2019 | $173.00 | Office Visit | 11/7/2019 | $88.44 |
| 71 | S.B. | 9/11/2019 | 10/9/2019 | $173.00 | Office Visit | 10/23/2019 | $88.44 |
| 72 | S.B. | 9/18/2019 | 10/9/2019 | $173.00 | Office Visit | 10/23/2019 | $88.44 |
| 73 | S.B. | 9/25/2019 | 10/9/2019 | $173.00 | Office Visit | 10/23/2019 | $88.44 |
| 74 | S.B. | 10/2/2019 | 11/12/2019 | $173.00 | Office Visit | 11/26/2019 | $88.44 |
| 75 | S.B. | 10/15/2019 | 11/12/2019 | $173.00 | Office Visit | 11/26/2019 | $88.44 |
| 76 | S.B. | 10/23/2019 | 11/19/2019 | $173.00 | Office Visit | 12/3/2019 | $88.44 |
| 77 | S.B. | 10/30/2019 | 11/12/2019 | $173.00 | Office Visit | 11/26/2019 | $88.44 |
| 78 | S.B. | 11/6/2019 | 12/17/2019 | $173.00 | Office Visit | 12/31/2019 | $88.44 |
| 79 | S.B. | 11/13/2019 | 12/17/2019 | $173.00 | Office Visit | 12/31/2019 | $88.44 |
| 80 | S.B. | 11/20/2019 | 12/17/2019 | $173.00 | Office Visit | 12/31/2019 | $88.44 |
| 81 | S.B. | 12/4/2019 | 4/1/2020 | $173.00 | Office Visit | 4/15/2020 | $88.44 |

| 82 | S.B. | 12/18/2019 | 4/1/2020 | $173.00 | Office Visit | 4/15/2020 | $88.44 |
| 83 | S.B. | 12/31/2019 | 4/1/2020 | $173.00 | Office Visit | 4/15/2020 | $88.44 |

18 U.S.C. § 1347
18 U.S.C. § 2

16

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the Defendant(s) that the United States will seek forfeiture as part of any sentence in accordance with 28 U.S.C. § 2461(c) and the other statutes cited herein, in the event of the Defendant(s)' conviction(s).

### Narcotics Forfeiture

2. Pursuant to 21 U.S.C. § 853(a), upon conviction of an offense in violation of the Controlled Substances Act, as alleged in the Narcotics Count(s), the Defendant(s) convicted of such offense(s), shall forfeit to the United States of America:

   a. any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such offense(s); and

   b. any property used, or intended to be used, in any manner or part, to commit, or facilitate the commission of, such offense(s).

### Fraud Forfeiture

3. Upon conviction of a violation of 18 U.S.C. § 1347, as alleged in Counts 2 through 83 of this Indictment, the defendant, IAN H. NEWBOLD, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

## Substitute Assets

3.   Pursuant to 21 U.S.C. § 853(p), if any of the property described above as being subject to forfeiture, as a result of any act or omission by the Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been comingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the Defendant up to the value of the property charged with forfeiture in the paragraphs above.

21 U.S.C. § 853
18 U.S.C. § 2461

*[signature]*

EREK L. BARRON
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**  9/7/2022
Date: